USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______________
DATE FILED: 8/27/26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CALVIN REED,

Plaintiff,

-against-

P.O. ANDRE LOGAN, et al.,

Defendants.

22-CV-10446 (JPC) (BCM)

**REPORT AND RECOMMENDATION TO THE HON. JOHN P. CRONAN**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Calvin Reed, proceeding pro se, alleges that a group of New York State parole officers assaulted and beat him without provocation on September 13, 2019, and then transported him to a residential treatment center where he was coerced into remaining silent about his injuries and consequently did not receive any medical care. Plaintiff brings claims under the Fourth, Eighth, and Fourteenth Amendments, pursuant to 18 U.S.C. § 1983, against Parole Officer Andre Logan, Senior Parole Officer Miguel Medina, Senior Parole Officer Shanavia Dandridge, and Area Parole Supervisor Nydia Garcia. Now before me for report and recommendation is defendants' motion for summary judgment (Dkt. 91), which – despite a reminder and an extension – plaintiff failed to oppose. After careful review of the record, I conclude that defendants' motion should be granted and this case should be dismissed.

## I. BACKGROUND

### A. Procedural History

Plaintiff Reed is a frequent litigant in this Court.[1] The present action had its origins in a case that he filed on October 5, 2020, captioned *Reed v. City of New York*, No. 20-CV-8352

[1] *See, e.g.*, *Reed v. Amster*, No. 05-CV-06142 (S.D.N.Y. dismissed July 19, 2005), *Reed v. Edmonds*, No. 05-CV-5906 (S.D.N.Y. dismissed Sept. 5, 2007); *Reed v. Doe*, No. 10-CV-6775 (S.D.N.Y. dismissed Mar. 5, 2013); *Reed v. City of New York*, No. 11-CV-6897 (S.D.N.Y. dismissed Mar. 5, 2013); *Reed v. Laquidara*, No. 12-CV-5053 (S.D.N.Y. dismissed Mar. 5, 2013);

(S.D.N.Y.), in which he initially complained that he was falsely arrested by the New York Police Department (NYPD) and was being held at Rikers Island without adequate protection from the COVID-19 virus. In an amended complaint, filed in that action on April 16, 2021, plaintiff added claims against Logan, Medina, Garcia, and Dandridge, alleging that they assaulted him and beat him on September 13, 2019. *See* Dkt. 12 in No. 20-CV-8352, at ECF pp. 2, 6-8, 49-50. On August 20, 2021, the Hon. John P. Cronan, United States District Judge, severed plaintiff's claims against the parole officers and directed the Clerk of Court to open those claims under a new docket number. *See* Dkt. 15 in No. 20-CV-8352, at 2. On December 8, 2022, after further direction from this Court, the present action was opened, *see* Dkt. 1, and on February 14, 2023, it was referred to me for pretrial management and report and recommendation on dispositive motions. *See* Dkt. 10.

On August 9, 2023, after defendants were served, I held an initial case management conference, which plaintiff attended by telephone from Fishkill Correctional Facility (Fishkill), where he was then incarcerated. *See* Dkts. 32, 33. On October 3, 2023, plaintiff filed his Second Amended Complaint (SAC) (Dkt. 36), which remains his operative pleading. *See* Dkt. 38.

In the SAC, plaintiff alleges that on September 13, 2019, while he was in Officer Logan's private office, he was beaten by the four named defendants, together with Officer "Gates" (not named as a defendant) and at least one additional "John Doe" officer, "unnecessarily and without any adequate reason." SAC at ECF p. 2. The parole officers allegedly punched him in the head and face, pulled on his arms, and struck him with batons, including behind his left knee and on his right thigh, "to make me bend and fall," *id*. at ECF p. 6, and then continued beating him as he lay on the ground, "without provocation." *Id*.

---

*Reed v. City of New York*, No. 22-CV-10444 (S.D.N.Y. dismissed Dec. 5, 2023); *Reed v. City of New York*, No. 20-CV-8352 (S.D.N.Y. dismissed Mar. 19, 2025).

Plaintiff further alleges that defendant Logan and one of the Doe officers transported him to the Edgecombe Residential Treatment Facility (Edgecombe) that same afternoon, rear-cuffed and leg-shackled, even though he was "injured and lim[p]ing." SAC at ECF p. 7. At Edgecombe, a nurse asked him if he was injured, but plaintiff remained silent, as Logan had "warned" him to do, and as a result he was deprived of medical treatment for his injuries. *Id.* Plaintiff complains that the parole officers were not provided with "body-worn cameras, to be worn at all times while on duty," *id.* at ECF p. 6, and alleges that if a better "oversight" system had been in place, the September 13, 2019 incident "would never [have] happened." *Id.* at ECF p. 7. As a result of the September 13, 2019 beating, and the lack of medical care at Edgecombe, plaintiff claims to have developed a "Baker's Cyst" behind his left knee,[2] as well as "possible degenerative arthritis," and suffers from hip and knee pain, as well as "mental and emotional stress." *Id.* Plaintiff attached a medical record dated May 2, 2022 – more than two and a half years after the alleged beating – stating that a sonogram conducted at Rikers Island revealed a "[p]robable Baker's cyst" behind plaintiff's left knee. SAC at ECF p. 10.

On October 25, 2023, defendants answered the SAC, denying any misconduct. Dkt. 39.

On October 30, 2023, I issued a case management order scheduling a status conference for January 18, 2024. *See* Dkt. 40 at 1. By then, plaintiff had been released from prison and was residing in the Bronx. *Id.* at 2. Plaintiff failed to appear at the January 18, 2024 conference (advising the Court's staff, when reached by telephone, that he was unaware of it). *See* Dkt. 43 at 1. He also failed to appear for the next two conferences, on February 1 and May 6, 2024, *see* Dkt. 44 at 1; Dkt. 51 at 1, and failed to respond to defendants' written discovery requests, despite

[2] "A Baker cyst is a fluid-filled growth behind the knee. It causes a bulge and a feeling of tightness." Mayo Clinic, "Baker Cyst," https://perma.cc/Z5TY-RCSK.

numerous written and telephonic reminders from this Court, along with express warnings that sanctions – including the dismissal of his case – could be imposed should he fail to appear for scheduled court proceedings or shoulder his discovery obligations. *See* Dkts. 44, 46, 47, 51.

On May 6, 2024 (at which point plaintiff had missed three court proceedings in a row and had not yet provided any discovery responses), I authorized defendants to file a motion to dismiss the case for "failure to prosecute, under Fed. R. Civ. P. 41(b), and/or for failure to comply with this Court's orders, under Fed. R. Civ. P. 16(f)." Dkt. 51. Defendants filed their motion on May 20, 2024. *See* Dkt. 52. Plaintiff then wrote a letter to the Court, dated June 10, 2024, requesting a further extension of time to serve his discovery responses and explaining that he missed the May 6, 2024 status conference due to the death of his fiancée in March 2024. See Dkts. 56, 57. On July 16, 2024, I granted plaintiff's request for yet another extension of his deadline to meet his written discovery obligations, until August 15, 2024, and held defendants' motion to dismiss in abeyance until that date. *See* Dkt. 66 at 2.

On August 12, 2024, defendants' counsel received plaintiff's responses to their written discovery demands. *See* Dkt. 77 ¶ 16. On August 27, 2024 – this time at defendants' request – I extended the fact discovery deadline to November 30, 2024, so that they could take plaintiff's deposition. *See* Dkt. 68. On September 26, 2024, plaintiff appeared for his deposition. *See* Dkt. 77 ¶ 17. *See* Dkt. 73. On October 11, 2024, I deemed defendants' motion to dismiss withdrawn, without prejudice to renewal. *See* Dkt. 69.

At defendants' request, I scheduled a pre-motion conference in anticipation of summary judgment for January 23, 2025, noting, "This is an in-person proceeding. Plaintiff must appear." Dkt. 72. Nonetheless, on January 23, 2025, plaintiff failed to appear. *See* Dkt. 74 at 2. In an order issued later that day, I adjourned the pre-motion conference to January 29, 2025 and again noted

that plaintiff was obligated to appear. *See id*. at 3. Possibly due to a delay in the mailing of the January 23 order, plaintiff – for the fifth time in a row – failed to appear on January 29, 2025. *See* Dkt. 75. At that conference, defendants requested leave to renew their motion to dismiss for failure to prosecute, which I granted. *Id*. Defendants filed their renewed motion to dismiss, pursuant to Rule 41(b), on March 5, 2025. Dkt. 76.

On September 9, 2025, the Court received correspondence from plaintiff advising that he was again in custody on Rikers Island. *See* Dkt. 83.

On October 28, 2025, I recommended that defendants' renewed motion to dismiss for lack of prosecution be denied (because, notwithstanding his failings, plaintiff eventually honored his discovery obligations, and the case was ripe for summary judgment or trial), and, on November 25, 2025, Judge Cronan agreed and denied the motion to dismiss. *See Reed v. Logan*, 2025 WL 3282713 (S.D.N.Y. Oct. 28, 2025), *adopted*, 2025 WL 3284948 (S.D.N.Y. Nov. 25, 2025).

Meanwhile, on November 12, 2025, plaintiff requested that discovery be reopened so that he could request "surveillance" videos showing the alleged assault on September 13, 2019. Dkt. 85. This was plaintiff's first (and only) effort to conduct discovery in this action. Defendants opposed the motion as untimely and represented that even if plaintiff were permitted to serve late discovery demands, they would be "futile" because defendants are "not aware of, or in possession of, any surveillance video or BWCs [body worn cameras] pertaining to Plaintiff's allegations." Dkt. 87. On November 20, 2025, I denied plaintiff's motion to reopen discovery. Dkt. 88.

By letter dated December 5, 2025, plaintiff advised the Court that he was out of custody, and provided an address in the Bronx. (Dkt. 90.)

**B. Defendants' Summary Judgment Motion**

Defendants filed their summary judgment motion on December 23, 2025, supported by their Local Civil Rule 56.1 Statement of Undisputed Facts (56.1 St.) (Dkt. 92), the Declaration of

Ian Ramage (Ramage Decl.) (Dkt. 93), attaching various exhibits, and a memorandum of law (Def. Mem.) (Dkt. 94). Defendants served their summary judgment papers on plaintiff by mailing them to the street address he provided in his December 5, 2025 letter. *See* Dkt. 95. Invoking *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), defendants primarily argue that no reasonable fact-finder could credit plaintiff's version of events, which is entirely uncorroborated, in some instances internally inconsistent, and uniformly contradicted by the documentary evidence gathered by defendants, including documents created in the ordinary course of business by DOCCS, DOC, NYPD, and the criminal courts. *See* Def. Mem. at 5-11. Insofar as the docket reveals, however, defendants did not serve plaintiff with the notice required, in pro se cases, by Local Civil Rule 56.2.[3]

Pursuant to Local Civil Rule 6.1(b), plaintiff's deadline to respond to the motion for summary judgment was January 6, 2026. On January 12, 2026 – plaintiff having failed to submit any response to the motion – the Court extended his opposition deadline, *sua sponte*, to January 30, 2026, and warned plaintiff that "if he fails to respond to defendants' motion, the Court may treat it as unopposed." 1/12/26 Order (Dkt. 96) at 1. Additionally, the Court attached a copy of this District's Motions Guide for pro se litigants, which contains, in substance, the same information required by Local Civil Rule 56.2. *Id.* at ECF pp. 6-7.[4] The 1/12/26 Order was served on plaintiff

[3] Rule 56.2 requires any represented party moving for summary judgment against a party proceeding pro se to serve and file a separate document, entitled "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment," that attaches the full text of Fed. R. Civ. P. 56 and Local Civ. R. 56.1 and explains the salient features of these rules, including that the party opposing the motion may no longer rely on the allegations in his complaint but must respond with "evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising specific facts that support your claim." Local Civ. R. 56.2.

[4] For example, the Motions Guide explains: "To successfully oppose a motion for summary judgment, you need to present the evidence, through declarations or exhibits, that demonstrates that there are disputes over important facts and therefore a trial is needed." 1/12/26 Order at ECF p. 6. It then goes on to explain, in detail, what a Rule 56.1 statement is and what the party opposing

by mail at his address of record. However, plaintiff never filed any opposition to defendants' summary judgment motion.

On February 9, 2026, defendants filed a letter requesting "that the Court dismiss this case for failure to prosecute or otherwise . . . grant Defendants' Motion for Summary [Judgment] for all the reasons set forth in their opening brief." Dkt. 97 at 1. That letter was also served on plaintiff, by mail, at his address of record. *See* Dkt. 97-1. However, plaintiff did not respond.

**C. Facts**

The following facts are taken from defendants' Local Civil Rule 56.1 Statement and the underlying evidentiary materials (attached to the Ramage Declaration), including *inter alia*, the New York Department of Corrections and Community Supervision (DOCCS) Chronological History Report for plaintiff, showing the dates on which he entered and exited various New York State facilities, *see* Ramage Decl. Ex. A (DOCCS History Rep.); plaintiff's Parolee Chrono Report, containing Officer Logan's contemporaneous notes of his interactions with plaintiff in 2019, *see id.* Ex. C (Chrono Report); various New York City Department of Correction (DOC) records concerning plaintiff's intake at Rikers Island on September 14, 2019 (the day after the alleged assault), *see id*. Ex. J; transcripts of plaintiff's parole revocation hearings, held at Rikers Island on September 27 and December 30, 2019, *see id.* Ex. M (9/27/19 Parole Tr.) & Ex. N (12/30/19 Parole Tr.); and DOCCS records reflecting plaintiff's medical treatment while incarcerated at the Fishkill Correctional Facility (Fishkill) in 2022-23. *See id.* Ex. P (Med. Records).[5]

---

summary judgment must do in response to the moving party's Rule 56.1 statement. *Id*. The Motions Guide specifically warns: "If you do not respond to the other party's 56.1 statement, or if you do not respond to a particular paragraph, the court may consider the opposing party's factual statement to be true." *Id*. at ECF p. 7.

[5] Other exhibits to the Ramage Declaration are cited in this Report and Recommendation as "Ex. ___."

Defendants also submitted plaintiff's complete deposition transcript. *See* Ramage Decl. Ex. B (Pl. Dep. Tr.). In many instances, plaintiff's deposition testimony is sharply at odds with the otherwise-consistent documentary evidence assembled by defendants. Not only does plaintiff claim that he was assaulted on September 13, 2019 (an event for which there is no corroboration elsewhere in the record); he claims to have been in entirely different institutions, at different times, than the documentary record reflects. Additionally, as discussed in more detail below, plaintiff's deposition testimony is at times inconsistent with his testimony during his parole revocation hearings, inconsistent with his pleadings in this case, and internally inconsistent.

**1. Conditions of Release and Revocation of Parole**

Plaintiff Reed was released to community supervision (parole) in November 2018, after a period of incarceration in the custody of DOCCS. *See* 56.1 St. ¶ 1. Defendant Logan was his parole officer. *Id*. ¶ 2 & Ex. D; *see also* Pl. Dep. Tr. at 62. On November 2, 2018, plaintiff acknowledged his conditions of release, certifying (among other things) that he would "notify [his] Parole Officer immediately any time [he was] in contact with or arrested by any law enforcement agency," that he would not "consume alcoholic beverages," and that he would "submit to substance abuse testing." Ex. D at ECF pp. 2-3. On November 8, 2018, plaintiff acknowledged additional conditions, certifying (among other things) that he "underst[ood] that [he had] an immediate and continuing duty to notify [his] Parole Officer of [any] arrest . . . and must report to [his] Parole Officer within 24 hours of [his] release from prison." *Id*. at ECF p. 4. Additionally, plaintiff affirmed that he would "not use nor possess . . . Alcohol[.]" *Id*.

The facts recounted above are undisputed.

**2. June 2019 Parole Violation and Placement in Edgecombe**

According to the DOCCS Case Summary for Warrant #831008, plaintiff tested positive for cocaine and/or alcohol, in violation of the terms of his parole, on several occasions in May and

June 2019, and was "under the influence of alcohol" when he reported to his parole officer on June 19, 2019. *See* Ex. E at ECF p. 5. Consequently, plaintiff was issued a Notice of Violation, *see id*. at ECF p. 2 (Notice of Violation, signed by plaintiff as "received" on June 19, 2019), but as an "alternative to incarceration" was placed in Edgecombe (a DOCCS-operated drug and alcohol treatment facility) for a 45-day diversion program. 56.1 St. ¶ 8; *see also* Ex. E at ECF p. 6 (noting that plaintiff was "accepted into Edgecombe C.F. on a Warrant as an alternative to incarceration on 6/19/19"); Ex. F at ECF p. 3 (DOCCS Area/Bureau Analysis, reporting that plaintiff "agreed to enter and complete" a 45-day diversion program at Edgecombe "as an alternative to incarceration").

DOCCS records reflect that plaintiff remained at Edgecombe from June 19 to August 1, 2019. 56.1 St. ¶¶ 8-9; *see also* DOCCS History Rep. at ECF p. 2 (showing that he entered "EDGE RES TRT" on June 19, 2019, and left on August 1, 2019); Ex. H at ECF p. 4 (DOCCS Case Summary, reporting that plaintiff "completed Edgecombe C.F. from 6/19/2019 through 8/1/2019"); Ex. F at ECF p. 2 (memo from Edgecombe, dated August 2, 2019, reporting that Reed "successfully Completed Program"). According to the DOCCS History Report (Ex. A), this was plaintiff's only stay at Edgecombe.

### 3. September 2019 Parole Violation and Arrest

On September 10, 2019, plaintiff was arrested by the NYPD following a domestic violence incident involving his 81-year-old fiancée, Betty McCain. 56.1 St. ¶ 10; *see also* Ex. G at ECF p. 2 (NYPD arrest report); *id*. at ECF pp. 3-4 (criminal complaint, charging plaintiff with assault and harassment). According to his contemporaneous notes, Officer Logan was informed about the arrest on September 12, 2026 – and was also informed that plaintiff had been released from Bronx Criminal Court the same day he was arrested, that is, September 10, 2019. Chrono Rep. at ECF p. 7; *see also* Ex. H at ECF p. 5 (Case Summary, reporting that plaintiff was "ROR'd on 9/10/19").

However, plaintiff did not contact Logan until Friday, September 13, 2019, when he telephoned and stated that he had gotten in "trouble with the police." Chrono Rep. at ECF p. 7. Logan reminded plaintiff that "it's a condition of his release that [] he report within 24 [hours] of any police contact," *id.*, and directed him to report to the Bronx Area III Parole Office that day. *Id.* at ECF pp. 6-7.

It is undisputed that plaintiff arrived at the parole office early that afternoon, 56.1 St. ¶ 12; Pl. Dep. Tr. at 77, and that when he arrived he was using a cane to walk, due to arthritis in his knees, back, and shoulder. Pl. Dep. Tr. at 83. It is also undisputed that plaintiff drank alcohol before arriving at the parole office. *See id.* at 77 (according to plaintiff, "one little light beer"). Logan's contemporaneous notes state that plaintiff's urine/drug test was again positive, and he smelled of alcohol. Chrono Rep. at ECF p. 6; *see also* Ex. H at ECF p. 5 (Case Summary, reporting that plaintiff "tested positive for cocaine and smelled of alcohol"). Logan brought plaintiff into his office, where they discussed the circumstances of plaintiff's recent arrest and his contact with police. Pl. Dep. Tr. at 79, 84-85. Logan told plaintiff that he smelled like alcohol, *id.* at 85, and plaintiff admitted that he "did have a beer." *Id.* Logan then issued plaintiff parole violation Warrant # 831064 and took him into custody. 56.1 St. ¶ 15; *see also* Chrono Rep. at ECF p. 6 ("warrant issued"); Ex. H at ECF p. 5 ("subject was taken into custody").

According to defendants, there is no additional paperwork documenting plaintiff's September 13, 2019 visit to the Bronx Area III Parole Office. 56.1 St. ¶ 14. Specifically, defendants say, there is no Unusual Incident Report, Use of Force Report, or Injury Report reflecting a physical altercation with plaintiff that day. *Id.* ¶ 13.

### 4. September 13, 2019 Admission to Rikers Island and Parole Revocation Hearings

According to defendants, once plaintiff was taken into custody on September 13, 2019, he was transported directly to Bronx Criminal Court, where he was "lodged and processed." 56.1 St.

¶ 16. This is consistent with Logan's contemporaneous notes, *see* Chrono Rep. at ECF p. 5 (noting that on September 13, 2019, at 4:55 p.m., Logan "RET'D FROM LODGING SUBJ. AT BX CRIM. COURT") and with the DOC's Property Receipt, dated September 13, 2019, which appears to bear plaintiff's signature. Ex. I at ECF p. 2.

Plaintiff was then taken to Rikers Island, 56.1 St. ¶ 17, where he was received at the Vernon C. Bain Center at 4:21 a.m. on September 14, 2019, and assigned a "Book & Case" number, *see* 56.1 St. ¶ 17; Ex. J at ECF p. 2 – after being screened for suicidality, *see* Ex. J at ECF p. 3-4, and various other risk factors, *see id*. at ECF pp. 5-10, and given an overall custody score of 4 ("minimum"). *Id*. at ECF p. 9 (DOC Initial Classification Form, signed "upon receipt" by plaintiff).[6] Less than two weeks later, on September 27, 2019, plaintiff attended his preliminary parole revocation hearing, held at Rikers Island, where he was represented by counsel. *See* 9/27/19 Parole Tr. at 3. Plaintiff was sworn in, stated that he wished to plead "guilty with an explanation," *id*. at 6, and testified at some length about various personal and family hardships, including his struggles to get and keep a job, his relapses, and his desire to attend an outpatient rehabilitation program. *See id.* at 7-9. However, he made no mention of any attack (or any other unusual event) during his September 13 visit to the Parole Office. Nor did he (or his lawyer) mention any injuries. Plaintiff was still at Rikers Island on December 30, 2019, for his final parole revocation hearing, at which he was represented by counsel and pled guilty to violating the terms of his parole. *See*

---

[6] Defendants state that plaintiff was "medically screened by NYC Health and Hospital personnel, where [sic] no behavioral or physical distress was noted." 56.1 St. ¶ 18. The underlying DOC records reflect that plaintiff was seen in the early morning hours of September 14, 2019 by Dr. Stanley Swabi, D.O., whose "disposition" was "GP [general population] with MH [mental health] follow-up Clinician/Psychiatrist." Ex. J at ECF p. 2. While it is true that no behavioral or physical distress was noted on this form (or on the other intake forms submitted by defendants), the records presented do not affirmatively demonstrate that plaintiff underwent a physical examination or other physical screening process on intake at Rikers Island.

12/30/19 Parole Tr. at 3. He was released on January 6, 2020. 56.1 St. ¶ 24; Ex. O (DOC discharge form).

Defendants requested plaintiff's medical records for his 2019-20 stay at Rikers Island, but "NYC Health and Hospital Correctional Health Services was unable to locate any medical record indicating that Plaintiff sought or received medical care for any injury." 56.1 St. ¶ 20; *see also* Ex. K (memo from Health & Hospitals – Rikers Island, stating that no records for plaintiff were located).

**5. Later Medical Treatment**

In 2022 and 2023, plaintiff was again detained at Rikers Island, and then incarcerated at Fishkill, on unrelated charges. On May 2, 2022, while at Rikers Island, he underwent a sonogram for a "[p]alpable soft tissue abnormality" of the left knee, which proved to be a "[p]robable Baker's cyst." SAC at ECF p. 10. Later that year, while at Fishkill, plaintiff sought medical attention for a number of conditions, including hip, back, and knee pain due to arthritis, and the cyst behind his left knee. *See, e.g.*, Med. Records at ECF p. 11, 12, 19, 21, 33 (progress notes referencing plaintiff's cyst, for which he was given Ibuprofen and an analgesic cream). Insofar as these medical records reflect, plaintiff never told the medical personnel at Rikers Island or Fishkill that he was assaulted on September 13, 2019 (or at any other time), and never linked his joint pain, or the Baker cyst, to his experience at the Bronx Area III Parole Office.

**6. Plaintiff's Testimony**

Plaintiff's deposition testimony – which is the only admissible evidence supporting his § 1983 claims in this action – is markedly inconsistent with the written records summarized above in several significant respects. Perhaps most strikingly, plaintiff flatly denies that he was admitted to Edgecombe on June 19, 2019, and likewise denies that he was admitted to Rikers on September 13, 2019. *See* Pl. Dep. Tr. at 70, 131. At deposition, plaintiff insisted, repeatedly, that his first and

only trip to Edgecombe was on September 13, immediately after he was beaten by the defendant parole officers, *id*. at 70, 121, 133, and that he was driven there directly from the Parole Office. *Id*. at 121, 123-24. Plaintiff further insisted that he stayed at Edgecombe for 45 days, from September 13 until mid-October 2019, *id*. at 131, which, if true, would have made it impossible for him to attend his preliminary parole revocation hearing, on Rikers Island, on September 27, 2019. I note as well that in his original complaint in this action (before his claims against the parole officers were severed), plaintiff acknowledged that after his arrest by the NYPD in September 2019:

> I informed my P.O. about the arrest and was told, "turn yourself in," and then I was violated and served five (5) months *on Rikers Island*.

Compl. (Dkt. 2) in No. 20-CV-8352 (S.D.N.Y. Oct. 5, 2020), at ECF p. 4 (emphasis added). This allegation, which is arguably binding on plaintiff,[7] is inconsistent with his deposition testimony but completely consistent with the DOCCS and DOC records provided by defendants.

Plaintiff's deposition testimony concerning his drug and alcohol use is also inconsistent with the written record – including his own prior testimony. At one point during his deposition, plaintiff flatly denied consuming any alcohol or using any illegal drugs while on parole, that is, between November 2018 and September 2019. Pl. Dep. Tr. at 70. During the same deposition, however, plaintiff conceded that he tested positive for alcohol "[a]bout two times" while on parole, *id*. at 88, and acknowledged that he "drank one little light beer" before arriving at Officer Logan's office on September 13, 2019. *Id*. at 77. At his September 27, 2019 preliminary parole revocation hearing – just two weeks after he was taken into custody for violating his parole – plaintiff testified

[7] *See Gibbs ex rel. Est. of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in . . . any pleading[] are judicial admissions that bind the [party] throughout this litigation."); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528-29 (2d Cir. 1985) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.").

that between November 2018 and September 2019 he had two relapses, although he "c[ouldn't] really remember the date" of the last one, and added that he was having "a lot of problems" and "really need[ed]" an outpatient program. 9/27/19 Parole Tr. at 8.

Plaintiff's deposition testimony concerning his visit to the Parole Office on September 13, 2019, although vivid and detailed, is wholly uncorroborated. Plaintiff claims that, when he was in Logan's office that day, Logan "wanted [him] to go to Cornerstone," a rehabilitation center, for "15 days[.]" Pl. Dep. Tr. at 86. Plaintiff resisted because he wanted to keep working at his job, *id.* at 85-86, 91, but "did not refuse." *Id*. at 91. Logan prepared some paperwork in his office, "for Cornerstone," and plaintiff signed his name "three times." *Id*. at 91-92. Then – without warning or explanation – Logan "grabbed [his] arm," *id*. at 92 (or his wrist, *id*. at 94), causing plaintiff to ask "what are you doing." *Id*. at 95, 104-05. At that point, "a whole pack of wolves," that is, seven or eight parole officers, rushed into Logan's office, handcuffed plaintiff, and "beat [him] like a pulp." *Id*. at 95-96. First, the officers pulled plaintiff up out of his seat, "turned [him] around, [and] handcuffed" him. *Id.* at 96. Then, several officers punched plaintiff's head "three [or] four times" with their fists. *Id*. at 96; *see also id*. at 99 (testifying that "all of them [were] beating on [him]" in his "eyes and everything, you know"). Officers also hit plaintiff in "the middle of [his] back . . . [a]bout three or five times." *Id*. at 100.

Plaintiff testified that "at least three" of the officers, including Logan and Medina, "had batons on them." Pl. Dep. Tr. at 101. At one point, Logan hit plaintiff's right leg with his baton, damaging the nerves in that leg. *Id*. at 97. Logan and Medina (or possibly just Medina) then hit him under his left knee, to make him "bend and fall." *Id*. at 101-04. Logan also hit him on the left shin. *Id*. at 104-05. Once he was on the floor, a female officer kicked him in the side. *Id*. at 102. Plaintiff, who was handcuffed, could not fight back or defend himself. *Id*. at 107. When asked why

the parole officers "would just storm in and just start assaulting you," plaintiff speculated that it was because he and Officer Logan "never got along." *Id*. at 109. Plaintiff believes that the assault was "[p]remeditated," *id*. at 110, and testified that it lasted "around a half hour." *Id*. Garcia did not physically attack him, but was present "in the group," and "did not intervene." *Id.* at 116.

When plaintiff described this alleged assault in the SAC, he complained that New York State failed to provide the parole officers with body-worn cameras. SAC at ECF p. 6. At deposition, however (by which time he had received defendants' automatic discovery responses pursuant to Local Civ. R. 33.2, *see* Dkt. 43 at 1, and knew that there was no BWC footage), plaintiff insisted, repeatedly, that the defendants were all wearing cameras, and that the footage would prove his case. *See* Pl. Dep. Tr. at 37 ("I want the film."), 132 ("They had cameras. Every last one of them had cameras," worn "[b]etween the shoulder and the chest[.]"), 168 ("I want the footage."), 171 ("I saw body cameras on them.").

Plaintiff's deposition testimony as to what happened after the alleged attack is both inconsistent with DOCCS records and, in part, internally inconsistent. At deposition, plaintiff stated that after he was beaten, all of the parole officers except for Logan "left the office." Pl. Dep. Tr. at 111. At this point plaintiff was "still handcuffed sitting on the chair." *Id*. Plaintiff did not explain how he got from the floor into the chair. Officer Logan then offered plaintiff a "deal": he could either go to Rikers Island indefinitely or go to Edgecombe for 45 days. *Id.* at 112. However, he could only go to Edgecombe if he did not "tell the nurse that [he was] hurt." *Id*. Plaintiff agreed to go to Edgecombe, *id*. at 112-13, and Logan took him there directly. *Id*. at 121, 123-24. Plaintiff testified that he stayed at Edgecombe for 45 days. *Id.* at 131.

When plaintiff got to Edgecombe, his face was "purple" and "red" and "swollen on the left hand side," with a bruise around the eye, and he was limping. Pl. Dep. Tr. at 27, 119-20, 122, 127.

In fact, he was "limping throughout the whole session of 45 days" at Edgecombe. *Id*. at 25. At deposition, plaintiff initially testified that when he got to Edgecombe he was seen by a nurse, who examined him, took his vitals, and asked if he was hurt. *Id*. at 124, 126. A few minutes later, however, he contradicted himself, stating that the same nurse did not ask him about his injuries, because "those parole officers . . . probably talked to her." *Id.* at 127-28. Plaintiff explained that did not volunteer any information about his injuries, or ask for any medical assistance, because Logan was still present during his intake at Edgecombe and was "looking dead at me." *Id.* at 130. He did not explain why he did not seek medical attention after Logan left – or, indeed, at any time during the 45 days he says he spent at Edgecombe after September 13, 2019.

After plaintiff saw the nurse, he "went upstairs," *id*. at 130, where there was a bathroom. *Id*. at 119. Initially, plaintiff testified that there was no mirror, "or nothing like that so you can look at yourself." *Id*. One question later, however, plaintiff testified that when he got upstairs, he "went to the bathroom," where he "looked at [his] face," which was "swollen." *Id*. at 120.

Plaintiff's deposition testimony is also inconsistent regarding his joint pain. At one point, he testified that he did not experience any knee problems or back pain before he was beaten by the defendant parole officers on September 13, 2019. *See* Pl. Dep. Tr. at 26-27. He also stated that he was diagnosed with arthritis in his knees "right after" the September 13, 2019 incident, *id*. at 21, which is also when he was diagnosed with a Baker cyst. *Id*. at 22.[8] At other points in his examination, however, plaintiff conceded that he "had arthritis before then," which was diagnosed

[8] As noted above, the earliest mention of the Baker cyst in the record is the sonogram report dated May 2, 2022, two and a half years later. *See* SAC at ECF p. 10.

when he turned 50, *id*. at 22, and that he was already walking with a cane when he arrived at the Parole Office on September 13, 2019, because he had arthritis in his knees. *Id*. at 83.[9]

## II. LEGAL STANDARDS

### A. Section 1983

Plaintiff's claims arise under 42 U.S.C. § 1983, which permits civil suits against those who, acting "under color" of state law, have deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution" or laws of the United States. "Section 1983 does not create any federal rights; rather, it provides a mechanism to enforce rights established elsewhere." *Soberanis v. City of New York*, 244 F. Supp. 3d 395, 400 (S.D.N.Y. 2017) (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002)). To prevail on a claim under § 1983, a plaintiff must show "that (1) the defendant was a state actor, i.e., acting under color of state law, when he committed the violation and (2) the defendant deprived the plaintiff of 'rights, privileges or immunities secured by the Constitution or laws of the United States.'" *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015) (citation omitted). "[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . [that] defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). In other words, there must be "evidence that each individual defendant was personally involved in" an alleged constitutional violation. *Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019).

Here, there is no question that the four named defendants were "state actors" on September 13, 2019. *See, e.g.*, *Murray v. New York City Department of Corr.*, 2016 WL 11395007, at *7 (E.D.N.Y. Aug. 18, 2016) (treating parole officers as state actors), *adopted sub nom. Murray v.*

---

[9] In September 2019, plaintiff was 60 years old. *See* Med. Records at ECF pp. 23-27 (giving his age as 63 from July through December 2022).

*NYC Dep't of Correction*, 2016 WL 5928672 (E.D.N.Y. Sept. 30, 2016). Nor do they deny that their alleged conduct – if it could be proven – would violate the Fourth Amendment, which prohibits the use of excessive force "in the course of an arrest for a parole violation." *Cox v. Fischer*, 248 F. Supp. 3d 471, 479 (S.D.N.Y. 2017) (collecting cases). Likewise, proof that a parole officer intentionally deprived a parolee of necessary medical care for a serious medical condition could make out a claim under the either the Eighth or the Fourteenth Amendment. *See Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020) (summary order) (noting that the Second Circuit has not yet decided whether a parolee's constitutional claim of inadequate medical care is properly analyzed under the Eighth Amendment, which applies to post-conviction prisoners, or the Fourteenth Amendment, which applies to pretrial detainees).[10] Rather – as discussed below – defendants contend that no reasonable juror could conclude that they engaged in the conduct attributed to them by plaintiff Reed.

### B. Summary Judgment

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Amaker v. Foley*, 274 F.3d 677, 680-81 (2d Cir. 2001). The movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).

---

[10] Regardless of which standard applies, the plaintiff must show that "the alleged deprivation of medical care was 'sufficiently serious'" so as to offend "contemporary standards of decency." *Horace*, 802 F. App'x at 14 (citations omitted).

If the movant meets its initial burden, the burden shifts to the non-moving party to establish, through admissible evidence, that there is a genuine dispute of material fact. *See Celotex Corp.*, 477 U.S. at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *accord SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).

Notwithstanding the burden-shifting structure contemplated by Rule 56, "the district court may not grant [a summary judgment] motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker,* 274 F.3d at 681. If not, "summary judgment is inappropriate, for '[n]o defense to an insufficient showing is required.'" *Id.* (alteration in original) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 161 (1970)). "Thus, Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion . . . is unopposed." *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014); *see also Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) "[T]he failure to respond to the [summary judgment] motion does not alone discharge the burdens imposed on a moving party."). This rule is particularly important where, as here, the moving party is unrepresented. *See Jackson*, 766 F.3d at 195 ("W[e] are less demanding of [pro se] litigants generally, particularly where motions for summary judgment are concerned.").

When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's

favor. *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 252.

Ordinarily, when applying these standards at summary judgment, the court may not "weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). However, "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys*, 426 F.3d at 554 (quoting *Anderson*, 477 U.S. at 252).

In such a case – specifically, where there is "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony," which "no reasonable person" could believe, *Jeffreys*, 426 F.3d at 555 – the court may appropriately grant summary judgment to the defendant. *Id.*; *see also Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 105-06 (2d Cir. 2011) (per curiam) (affirming grant of summary judgment to defendant where plaintiff's opposition relied "almost entirely on her own testimony," which was inconsistent in part with her pleadings and prior testimony, and where defendant submitted "competent and persuasive evidence," including contemporaneous documents, contradicting that testimony); *Oakley v. MSG Networks*, 2026 WL 2364632, at *3, 9 (S.D.N.Y. Aug. 14, 2026) (Sullivan, J.) (granting summary judgment to defendants, notwithstanding plaintiff's testimony that he was

assaulted by security personnel at Madison Square Garden, where that testimony was both uncorroborated and contradicted by "an accumulated tidal wave of evidence" from other sources); *Roland v. City of New York*, 2024 WL 2832691, at *20 (S.D.N.Y. June 3, 2024) (granting summary judgment to defendants on malicious prosecution claim, notwithstanding plaintiff's deposition testimony to the effect that defendant law enforcement officers fabricated the evidence against him, where that testimony was uncorroborated, "contradictory, inconsistent[,] and incomplete on matters core to his allegations of fabrication"); *LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, 2023 WL 6610764, at *10 (S.D.N.Y. Oct. 10, 2023) (rejecting plaintiff's deposition testimony as to one aspect of her hostile work environment claim where that testimony was uncorroborated, inconsistent with her prior testimony, and contradicted by substantial evidence adduced by defendants, including contemporaneous records). Where the moving party relies on the *Jeffreys* exception, it "still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys*, 426 F.3d at 554.

## III. ANALYSIS

### A. Rule 56.2

Before addressing defendants' legal arguments, I must consider whether their apparent failure to comply with Local Civil Rule 56.2 prohibits the Court from acting on their summary judgment motion. I conclude that it does not, because the purpose of Rule 56.2 "is to ensure that a party acting pro se 'understands its burden in responding to a motion for summary judgment, and the consequences of failing to do so,'" *Rivera v. Goulart*, 2018 WL 4609106, at *3 (S.D.N.Y. Sept. 25, 2018) (quoting *Hartford Life Ins. Co. v. Einhorn*, 452 F. Supp. 2d 126, 129 (E.D.N.Y. 2006)), and the moving party's failure to serve the required notice is grounds for denial of the motion only "if it is not otherwise clear from the record that the *pro se* litigant understood the nature of the

summary judgment motion." *Hartford Life Ins. Co.*, 452 F. Supp. 2d at 120 (citing *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999)); *see also Davidson v. Lee*, 2021 WL 5054118, at *1 (S.D.N.Y. Nov. 1, 2021) (moving party's failure to serve complete copies of the relevant federal and local rules was "not . . . fatal" where the truncated notice that was served "explain[ed] the obligation of the non-moving party to oppose with evidence," and the plaintiff was "an experienced *pro se* litigant"); *Pieczenik v. Cambridge Antibody Tech. Grp.*, 2004 WL 527045, at *4 (S.D.N.Y. Mar. 16, 2004) (moving party's failure to comply with Local Civil Rule 56.2 did not require denial of motion because, among other things, the court itself "notified Pieczenik of his rights in a December 31 Order").

Here, plaintiff received ample guidance – directly from the Court – explaining the nature of a summary judgment motion, extending his time to oppose that motion, and advising him, among other things, that he must present "evidence, through declarations or exhibits, that demonstrates that there are disputes over important facts and therefore a trial is needed." 1/12/26 Order at ECF p. 6. Moreover, while plaintiff failed to file any opposition to defendants' motion, there is no reason to believe that this is because he did not understand his obligation to do so. Rather, it is consistent with his repeated failure – in this case and in other cases – to comply with his litigation obligations, despite frequent reminders and repeated warnings that he risked dismissal of his claims. *See Reed v. Logan*, 2025 WL 3284948, at *1 (advising plaintiff that his "repeated non-compliance with Judge Moses's orders" could lead to sanctions, "including dismissal of this action with prejudice"); *Reed v. City of New York*, 2025 WL 863708, at *1, 3 (S.D.N.Y. Mar. 19, 2025) (dismissing plaintiff's claims in light of his "continual and repeated failures to meet deadlines set by the Court and appear at conferences," despite reminders and warnings, and his "failure to respond to any of the Court's recent orders,"), *appeal dismissed* (July 21, 2025). Since

plaintiff was adequately advised of his "burden in responding to a motion for summary judgment, and the consequences of failing to do so," *Rivera*, 2018 WL 4609106, at *3, defendants' failure to serve the notice required by Local Civil Rule 56.2 need not keep this Court from analyzing the motion on its merits.

### B. No Reasonable Juror Could Return a Verdict for Plaintiff

Here, as in *Jeffreys*, plaintiff's testimony – as to both of his constitutional claims – is "unsubstantiated by any other direct evidence," (or, for that matter, by any circumstantial evidence), and "so replete with inconsistencies and improbabilities" that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." 426 F.3d at 555. (citation omitted). Moreover, as in *Oakley*, "an accumulated tidal wave of evidence" squarely contradicts fundamental elements of plaintiff's case. 2026 WL 2364632, at *9.

To begin with the basics: plaintiff's claim that he was deprived of adequate medical care at Edgecombe on and after September 13, 2019 depends on his ability to show that Logan took him to Edgecombe on September 13, 2019, where he remained for the next 45 days. No rational juror could believe plaintiff's testimony on this point, because it is contradicted by a raft of contemporaneous records, created by two separate agencies (DOCCS and DOC) in the ordinary course of their business, all of which reflect that on September 13, 2019, plaintiff was taken directly from the Bronx Area III Parole Office to the Bronx Criminal Court, and then to Rikers Island, where he was screened and admitted in the early morning hours of September 14, 2019, and where he remained until January 6, 2020.[11] Moreover, on October 5, 2020 – the first time

[11] *See* Chrono Rep. at ECF p. 5 (contemporaneous record made by Logan stating that he took plaintiff to Bronx Criminal Court); Ex. I at ECF p. 2 (DOC Property Receipt, dated September 13, 2019, bearing what appears to be plaintiff's signature); Ex. J at ECF p. 10 (Rikers Island New Admission screening form, dated September 13, 2019); *id*. at ECF p. 2 (Riker's Island Disposition

plaintiff mentioned his September 13, 2019 parole violation arrest in a legal pleading – he acknowledged that after he reported to his parole officer, "I was violated and served five (5) months *on Rikers Island*." Compl. (Dkt. 2) in No. 20-CV-8352, at ECF p. 4 (emphasis added). I note as well that even judged in isolation, much of plaintiff's testimony as to his supposed medical treatment at Edgecombe on September 13, 2019 is "contradictory and incomplete." *Jeffreys*, 426 F.3d at 554.[12] On this record, plaintiff's deposition testimony is insufficient to create a "genuine" dispute of fact, *Anderson*, 477 U.S. at 248, because no "reasonable jury could return a verdict" in his favor on his claim of deliberate indifference to his serious medical needs. *Id.*; *see also Rojas*, 660 F.3d at 104 (affirming grant of summary judgment where, given the "inconsistencies and contradictions" in plaintiff's account, "there were no *genuine* issues of material fact that would allow a reasonable jury to find in Rojas's favor").

Plaintiff's excessive force claim should also be dismissed for lack of evidence sufficient to create a genuine issue of disputed fact. Once again, plaintiff's deposition testimony is the *only*

---

Form, signed by Dr. Swaby and dated September 14, 2019 at 4:21 a.m.); *id.* at ECF p. 9 (Rikers Island Initial Classification Form, dated September 17, 2019 and bearing what appears to be plaintiff's signature); 9/27/19 Parole Tr. (transcript of preliminary revocation hearing, held on Rikers Island); 12/30/19 Parole Tr. (transcript of final revocation hearing, held on Rikers Island); Ex. O (Rikers Island discharge form).

Plaintiff did indeed spend almost 45 days in Edgecombe, from June 19 to August 1, 2019. *See* DOCCS History Rep. at ECF p. 2; Ex. E at ECF pp. 5-6; Ex. F at ECF pp. 2-3; Ex. H at ECF p. 4. However, plaintiff does not allege that he was denied any medical treatment during that stay. In fact, he denies that he was there at all before September 13, 2019. *See* Pl. Dep. Tr. at 70, 131.

[12] For example, he testified that the nurse who admitted him asked if he was "hurt," inquired as to how he was feeling, and "examined" him. *See* Pl. Dep. Tr. at 124, 126. A minute later, he testified that the nurse did *not* ask him any questions – even though she saw his red and swollen face – because defendant Logan had "probably talked to her." *Id*. at 127-28. Plaintiff also testified that he was afraid to ask for medical treatment while Logan was there, *see id*. at 130, but never explained why he did not seek assistance at any time after Logan left. Nor, for that matter, did he explain why no one at Edgecombe noticed that he was bruised, swollen, and "limping throughout the whole session of 45 days." *Id*. at 25.

evidence that *any* force was used against him on September 13, 2019. There is no Unusual Incident Report, no Use of Force Report, and no Injury Report reflecting a physical altercation with plaintiff that day. 56.1 St. ¶ 13; Ramage Decl. ¶ 19. To be sure, it is theoretically possible that a group of lawless and corrupt officers could physically assault a parolee for no reason, fail to report the use of force, and threaten the parolee that if he did not keep silent he would be sent to Rikers Island. However, the gaps, inconsistencies, and internal contradictions in plaintiff's account render it "so problematic that no reasonable juror could possibly find in his favor." *Fuentes v. Schemmer*, 2023 WL 188739, at *6 (S.D.N.Y. Jan. 13, 2023) (granting summary judgment in excessive force case notwithstanding plaintiff's deposition testimony that the police "came to my car . . . opened the door, and threw me right on the floor").

For example, plaintiff's only explanation for his failure to report the alleged assault or the resulting injuries to anyone – at any time before he filed the instant lawsuit – is that Officer Logan threatened to send him to Rikers Island if he revealed what had occurred, *see* Pl. Dep. Tr. at 112, and Logan was still with him, "looking dead at [him]," during his admission at Edgecombe. *Id*. at 130. In fact, as the documentary record makes clear, plaintiff *was* sent to Rikers Island almost immediately after his arrest for the parole violation (stopping only at Bronx Criminal Court). If the "deal" was that plaintiff would keep silent in return for being kept out of Rikers Island, then plaintiff had no reason to stay silent once he was screened for admission at Rikers Island in the early morning hours of September 14, 2019. Yet – insofar as the record reveals – he never complained about the alleged assault during his stay at Rikers Island; never brought it up at his parole revocation hearings on September 27 and December 30, 2019 (during which he was represented by counsel); and never sought or received medical treatment – for any reason – during

his 2019-20 stay on Rikers Island. *See* Ex. K.[13] Similarly, although plaintiff was treated for joint pain and a Baker cyst in 2022-23, while incarcerated at Fishkill, he never mentioned to his medical providers there that he had been assaulted in 2019, much less suggested that his symptoms were related to the alleged assault. *See* Ex. P (Fishkill medical records).

Plaintiff's evolving assertions regarding the use of body worn cameras at the Area III Parole Office are also "problematic." *Fuentes*, 2023 WL 188739, at *6. At deposition, plaintiff insisted that "[e]very last one of" the officers involved in the attack had body-worn "cameras . . . [b]etween the shoulder and the chest," Pl. Dep. Tr. at 132, and thus that corroborating evidence exists, if only defendants would produce it. *See id.* at 168 ("I want the footage."). But in his operative pleading, plaintiff affirmatively alleged the "Attorney General of New York State failed to . . . provide the officers with body-worn cameras," SAC at ECF p. 6, and claims that this failure was partly responsible for the assault he says he suffered. *Id*

The *Jeffreys* exception to the rule again judging credibility at the summary judgment stage is "a narrow one," *Fuentes*, 2023 WL 188739, at *6, reserved for cases where "the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete [and] is so problematic that no reasonable juror could credit it." *Id*. (quoting *Frost*, 980 F.3d at 245). As shown above, however, this is just such a case. Taken as a whole, the internal inconsistencies and contradictions in plaintiff's deposition testimony, together with the fact that his account is entirely uncorroborated, contradicted in substantial part by consistent contemporaneous documentation,

---

[13] As noted above, plaintiff's testimony that his that he was diagnosed with arthritis in his knees and a Baker cyst "right after" the September 13, 2019, *see* Pl. Dep. Tr. at 21-22, is soundly contradicted by the record, which shows that plaintiff had significant arthritis pain before September 13, 2019 – enough to require the use of a cane, see Pl. Dep. Tr. at 22, 83 – and that the Baker cyst was not diagnosed until May 2, 2022 – over two and a half years after the alleged assault. *See* SAC at ECF p. 10.

and inconsistent with several of the allegations in his own pleadings, warrants the conclusion that "no reasonable person would credit Plaintiff's testimony," *Brinson v. Kirby Forensic Psychiatric Ctr.*, 2018 WL 4680021, at *9 (S.D.N.Y. Sept. 28, 2018), and therefore that defendants are entitled to summary judgment. *Id.* (granting summary judgment on excessive force claim where plaintiff testified that he was "slammed to the ground" by Kirby staff, suffering shoulder and leg injuries, but that testimony was "uncorroborated," "contradicted by the contemporaneous medical records," and "at odds with the allegations in Plaintiff's complaint," which alleged only that he was "held down" by Kirby staff and "injured mentally and emotionally").

## IV. CONCLUSION

For the reasons stated above, I recommend, respectfully, that defendants' motion for summary judgment (Dkt. 91) be GRANTED, and that this action be dismissed.

Dated: New York, New York
August 27, 2026

**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), unless they receive this Report and Recommendation solely by mail, in which case they have 17 days from the date on which it was mailed. *See* Fed. R. Civ. P. 6(a), 6(d). Any objections must be filed with the Clerk of the Court, addressed to the Hon. John P. Cronan, and delivered to Judge Cronan in accordance with his individual practices. Any request for an extension of the deadline to file objections must also be directed to Judge Cronan. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).